522 So.2d 705 (1988)
Ferdinand P. CURTIS,
v.
HIBERNIA NATIONAL BANK in JEFFERSON PARISH.
No. 87-CA-543.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 1988.
*706 Peter S. Thriffiley, Thomas J. Lutkewitte, Favret, Favret, Demarest & Russo, New Orleans, for defendant-appellant.
Edward J. Mozier, Jr., New Orleans, for plaintiff-appellee.
Before BOWES, GRISBAUM and GOTHARD, JJ.
GRISBAUM, Judge.
The principal question presented is whether a depositary of money (Hibernia National Bank, the appellant) in paying on forged items spends its own funds or those of its depositor (the original plaintiff-appellee). It was stipulated by counsel that the bank paid out $4200 in funds on checks that were forged and charged same to the plaintiff's account. The trial court ruled in favor of the plaintiff-depositor. From this decision, Hibernia National Bank appeals. We affirm.
FACTS
The plaintiff's action is against the bank to recover the monies paid out and charged to his account under the forged checks. The record shows the plaintiff, Mr. Ferdinand P. Curtis, testified that he had maintained a checking account in the same bank for about 20 years. At first, he kept very accurate account of the balance; however, as he got older, he estimated the balance in his head, explaining "At the end of the month when my statement came I checked all the checks against the ... bank statements just to verify they were mine." Mr. Curtis had found this approach to be adequate to his needs, there generally being "several thousand dollars in the account."
The record also shows that in 1985, Mr. Curtis had about $1500 of checks that were forged. Mr. Curtis discovered the forgeries after receiving his bank statement and immediately informed the bank. Upon the advice of bank personnel, he opened a new account and closed the old one. He does not recall anyone, at that time, telling him he had been negligent in the manner in which he kept his account. No one advised him to maintain his account any differently.
As to the 1986 forgeries in question, he reports that he first discovered their existence when he got his monthly statement. He then "went to the bank and spoke with one of the ladies in the back on it and we closed the account again and I filled out the necessary forms and notarized them and so forth." He does not recall being phoned by a bank employee about February 19, 1986 and being informed that his account was overdrawn. Mr. Curtis believes the checks were stolen from his desk. However, he had tried to ensure that they were in a safe place.
Upon writing a check, Mr. Curtis reports, he generally wrote the check amount and check number in his checkbook. He did not always carry down the balance, however. Although the testimony is unclear, Mr. Curtis apparently states that the forged checks were taken from a checkbook other than the one he was then writing his own checks from, the numbers of the forged checks being out of sequence with his own. Mr. Curtis repeats that he would rectify his account at the end of each month upon receiving his statement. Curtis admits the drawer in which he kept his checkbook was not locked. On redirect, however, he clarifies that the desk is not equipped with a lock.
First called by the bank, Mary Benn is an assistant manager at Hibernia. She reports *707 that on February 19 she had called Mr. Curtis to inform him that he was overdrawn. Mr. Curtis made a deposit to cover the overdraft and asked if Ms. Benn thought there might be some check forgeries involved. She continues:
A. I told him I didn't know anything about any forgeries. I asked him did he have checks missing and he said that he didn't know, that he didn't keep a record[,] [that] he just kept it in his head. So, I asked him if he would check and let me know and I didn't hear anything, so I assumed everything was okay.
Q. You asked him to check to see if he had any missing checks?
A. That's correct.
Q. He never got back to you?
A. No.
Q. What was the next time you heard from Mister Curtis?
A. When he came in with the forged checks telling me that they were forged.
Q. And, do you recall the date?
A. I don't recall the date. It was right around March twentieth, something like that, maybe twenty-second.
Q. He completed the forgery affidavits at that time?
A. He did.
Q. When did you next hear from Mister Curtis?
A. Okay. After he brought the checks in then he called me on the phone a short time after that. I don't recall the date. He said the gentleman was at his house and he wanted to know if we could work out some kind of a deal for him to make the payment to the bank. And, I told him, at that time, that we couldn't discuss those arrangements with him, that he would have to contact our security department.
Ms. Benn maintains that had Mr. Curtis told her on February 19 that checks were missing, she would have suggested closing "the account immediately to prevent further loss to him or to the bank in any case." She adds that all but two of the forgeries would probably thus have been averted. Curtis did not ask that his account be closed.
On cross-examination, Ms. Benn in effect concedes that, after the prior forgery episode, no one suggested to Mr. Curtis that he was negligently handling his account. She says he did not state that he did not keep track of his checks and the bank did not inquire. When asked when the bank would check a maker's signature, Benn says, "If we had something that we thought might be a forgery, or something, we can have bookkeepers pull that out, providing the customer notifies us[,] and when these items come through they can be checked on a daily basis." She adds, however, that normal procedure in the face of suspected forgery would be to close the account. Ms. Benn concedes that "a lot" of customers probably rely on their statements to keep track of their accounts. On redirect, Ms. Benn says that in this case a "restrain" was placed on Mr. Curtis' account the same date the notification of forgery was received.
Next called by the defendant was Daniel P. Dunn, formerly with the Forgery and Fraud Division of the New Orleans Police Department, now a bank officer working in audit security. He testified that Hibernia does not verify signatures on any check cashed over the teller line unless the item is $20,000 or above. He continues,
It's cost prohibative, due to the amount and the volume of checks coming through the bank....
Q. Based on your experience is that the procedure followed by other banks in the area?
A. I believe there's only one bank left that checksthat verifies signature[s] by check and I think that's Whitney National Bank. I believe nine out of every other ten banks in the country... do not verify them by signature.
On cross-examination, Mr. Dunn reports that if a customer notifies the bank that some of his checks are missing, a hold is placed on the account.
Called in rebuttal, Mr. Curtis does not recall Ms. Benn asking him to ascertain whether any of his checks were missing.
*708 ANALYSIS
Under La.R.S. 10:3-404,
(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.
(2) Any unauthorized signature may be ratified for all purposes of this Chapter. Such ratification does not of itself affect any rights of the person ratifying against the actual signer.
As defined, in turn, by La.R.S. 10:1-201, "`Unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." "No person is liable on an instrument unless his signature appears thereon." La. R.S. 10:3-401.[1] Given these provisions, the general rule of liability on a forged instrument, as derived by W. Hawkland and H. Bailey, III, is as follows:
Since an unauthorized signature is wholly inoperative as that of the person whose name is signed, it follows that a payor bank which pays a forged check may not charge the amount thereof to the drawer's account [UCC 3-404(1)]. In addition, the forged instrument may not be charged against the account as it is not properly payable under UCC 4-401(1). The same principle should apply to a non-bank drawee of a draft bearing the forged signature of the purported drawer. In other words, the drawee or payor bank pays out its own money and not that of the drawer or customer whose signature is forged, since the bank's contract is to pay only on its customer's order. Stated another way, a bank is required to know the signatures of its customers who carry accounts with the bank.
Sum & Substance of Commercial Paper, § 5.2300, p. 192. (Emphases in the original.) The contemporary rule is consistent with that established by the Louisiana jurisprudence in Etting v. Commercial Bank, 7 Rob. 459 (La. 1844), wherein it was held the defendant bank was liable for monies paid out on several forged instruments because "The depositary must take care that he pays none but the checks or drafts of the depositor." Id. at 463. See Allan Ware Pontiac, Inc. v. First Nat'l Bank of Shreveport, 2 So.2d 76, 79 (La.App. 2d Cir.1941), cert. denied, April 28, 1941, for a recitation of the same rule under the Negotiable Instruments Law.
Having established the general rule, we must necessarily determine whether the depositor's negligence precludes him from invoking it. Under La.R.S. 10:3-406,
Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.
As explained by U.C.C. Comment 3 to § 3-406, "No attempt is made to define negligence which will contribute to an alteration. The question is left to the court or the jury upon the circumstances of the particular cases." Accordingly, this constitutes a finding of fact, such an assessment being reviewable under the manifest error standard. See Ortego v. Ortego, 471 So.2d 1106, 1110 (La.App. 3d Cir.1985).
We also note the trial court, in its Reasons for Judgment, states
The bank has attempted to indicate that the plaintiff was somehow negligent to the extent that it would vitiate their payment, since apparently this had happened a year or so before. Testimony is quite clear that the plaintiff indicated that his account was overdrawn and, at that time, asked whether or not there were any forgeries. The bank did not check any forgeries at that time, but rather asked him to advise if any further checks were *709 missing. He did not contact them again. He states he doesn't remember it and there was a delay in further contacting the bank at that time. The court is of the opinion that that neglect, if it is categorized as such, is not sufficient to vitiate the bank's responsibility in this case. The court is well aware that many accounts, held by individuals, are simply not checked with the preciseness that the bank would like. That the accounts are not reconciled on an ongoing basis and are indeed not even checked when statements come in. But, that is still immaterial to the overriding question. There is no doubt at all, but that the bank policy for economic reasons is such that they do not check signatures and, as such, they are liable for the amount of damages sought in this particular case. The court recognizes their economic reasons for this, but nevertheless unless there is overriding negligence on the part of the plaintiff, which is not present in this case, the bank is liable.
We agree with the trial court's rationale and also recognize that La.R.S. 10:4-406 gives the drawer a reasonable time after receiving his checking statement to notify the bank of any forgeries detected. Accordingly, after a careful review of the record, we find the trial court had a reasonable factual basis for its factual conclusions and its findings and conclusions are not "clearly wrong."
For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellant.
AFFIRMED.
NOTES
[1] See also Colonial Bank v. Marina Seafood Market, Inc., 425 So.2d 722, 724 (La.1983): "No person may be held liable on a negotiable instrument unless his signature appears thereon."