689 So.2d 638 (1997)
GULF STATES SECTION, PGA, INC. and The Travelers Insurance Company
v.
WHITNEY NATIONAL BANK OF NEW ORLEANS.
No. 96-CA-0844.
Court of Appeal of Louisiana, Fourth Circuit.
February 12, 1997.
*639 Thomas H. Matuschka, Grayson H. Brown, Law Firm of Grayson Brown, Baton Rouge, for Plaintiffs/Appellants.
Jay Corenswet, Mary L. Grier Holmes, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for Defendant/Appellee.
Before BYRNES, ARMSTRONG and JONES, JJ.
ARMSTRONG, Judge.
In this suit to recover payments made on forged checks, the plaintiffs, Gulf States Section, PGA, Inc. (the "PGA"), and its insurer, The Travelers Insurance Company ("Travelers"), appeal from a judgment rendered against them and in favor of the plaintiff, Whitney National Bank of New Orleans ("Whitney"). We now affirm the judgment of the trial court.
During a four month period in 1992, from May through August, an employee of PGA, Adrenetti Collins, a secretary, forged and negotiated eighteen PGA checks totalling $22,699.81. Travelers paid the PGA this amount, less a deductible, under an insurance policy. Travelers and PGA instituted this action against Whitney, which paid the forged instruments, seeking reimbursement. Collins was hired as a temporary employee sometime in February or March 1992 by Robert Brown, the executive director of the Gulf States Section of the Professional Golf Association. He employed Collins, whom he knew as Elizabeth Couch, an alias, as a full-time employee in May 1992. Unbeknownst to Brown, in 1982 Collins had been convicted of the theft of $5,445.07 from a previous employer, which she obtained by forging and negotiating twenty company checks. She also had a 1985 conviction for issuing worthless checks.
The trial court found that Brown's negligence contributed to the forgeries and therefore the defendants were precluded from recovering from Whitney, which made payment on the forged instruments. Brown testified *640 that his PGA office had a staff of three, including a secretary. While three of "his officers" were authorized to write checks, Brown said they were not in the office. He primarily signed checks and was responsible for paying bills and handling the bank accounts. The checks were made to be tractor-fed through a printer. The checks came in lots of 2,000, all connected to be fed through the printer, and were kept in a box beneath the printer stand in Brown's office. Collins had access to his office. Brown wrote approximately 150-200 checks a month and used a computer program, Quicken, to write and record the checks.
The checks were sequentially prenumbered. Using the program, Brown would bring up a representation of a check on his computer screen, type in the information on the screen, the name of the payee, the amount, etc., and then print the check. The check roll was not always hooked up to run through the printer so, when preparing to print out a check, Brown would have to align the checks so the information as to payee, amount, etc. would be correctly printed on the blank check. During this alignment process Brown would make errors, resulting in checks being printed which he could not use because the information as to payee, amount, etc. was not printed correctly. Brown would adjust the feed system until a check would feed through so the information would be correctly printed on the check. When printing a check the program would prompt the user based on the last check the user had entered in the program as having been printed, or otherwise accounted for. When Brown used the program he would simply look at the blank checks to see which prenumbered blank check was next to be fed through the printer, override the computer program, enter that number, and print out that check. Brown failed to account for check numbers that he messed up and destroyed during the alignment process.
The first forged checks were numbered 6365, 6366, 6367, 6368, 6369, and 6370. The checks numbered 6365 and 6367 were negotiated on May 4, 1992. Brown wrote check number 6371 on May 1, 1992. Obviously, Collins had taken checks numbered 6365-6370 prior to May 1, 1992. These five checks were missing; the computer program had no record of them. When Brown went to print check number 6371 on May 1, 1992, he simply overrode the program and printed out 6371, the next check in line.[1]
Collins presumably intercepted both the May and June 1992 bank statements sent by Whitney to Brown. She prepared forged statements leaving out the numbers of those checks she had stolen. The usual Whitney statement is printed on canary or vanilla colored paper measuring a non-standard 6 ¾ × 11 inches. The crudely forged statements were on standard 8 ½ × 11 inch white paper. Although Collins apparently copied the Whitney logo onto the top left corner of the forged statements, the forged statements in evidence are glaringly different than the usual Whitney statement, even aside from the qualities of color and size. Unlike the usual statement, the forgeries have no box outlines containing the information on the balance as of the last statement, the balance as of the current statement, the total amounts of deposits and credits, or the total amount of checks and debits. The forged statements are not even dated, which are contained in a box outline on the usual statements. Not surprisingly, there are no asterisks on the forged statements indicating a break in check number sequence as there is on the usual statements.
Yet, Brown testified that when he got the forged statements for May and June 1992, he simply reconciled them. Brown was responsible for reconciling the PGA bank statements. The forged statements contained cancelled checks, but not, of course, the ones Collins had forged and negotiated. Brown received the May 1992 statement on June 9 or 10, the June statement sometime in July. He did not receive any statements for July and August. On August 31, 1992, Collins asked for a leave of absence. On September 18, 1992, Brown received an overdraft notice *641 from Whitney. This was the first inkling Brown had that something was amiss. He asked for copies of the July and August 1992 statements and, upon receiving them, discovered the unauthorized use of the account. He immediately notified Whitney.
Among other stipulations by the parties, it was stipulated that in 1992 Whitney's policy was to verify makers' signatures on checks written on commercial accounts in the amount of $5,000.00 and over. It was further stipulated that in 1992 the First National Bank of Commerce verified makers' signatures on checks for individual and commercial accounts in the amount of $10,000.00 and over, and that in 1992 Hibernia National Bank verified makers' signatures on checks for individual and commercial accounts in the amount of $20,000.00 and over. Forged check number 6599 was in the amount of $5,000.00 and there is no evidence Whitney verified Brown's signature before paying on it.
George Panzeca Jr. was qualified by the court as an expert in certified public accounting practices. Panzeca testified that Brown's practices concerning the handling of the PGA account were not appropriate. Panzeca said the checks should have been secured, not just kept under the printer stand in a box. He said Brown should have kept track of the checks more closely and if he had would have known something was wrong on May 1, 1992, when he made out a check using the computer program and check number 6371 was the next check to be printed. At that point none of the stolen checks had been negotiated. Panzeca also testified that Brown should have been alerted that something was wrong when he received the forged May statement in early June, as well as when he received the forged June statement. Panzeca testified that it was his opinion that Brown failed to follow proper procedures in handling the PGA checking account and this substantially contributed to Collins being able to forge the checks.
The trial court gave four pages of reasons for judgment. The court found that Brown could have discovered that six checks had been stolen by May 1, 1992, the date he printed out check number 6371. The court made several other findings as to Brown's failure to properly handle the PGA account and ultimately found that Brown's negligence substantially contributed to the forgeries. The court also found that Whitney used reasonable commercial standards as to the handling of the PGA account.
On appeal the plaintiffs raise several issues. Plaintiffs submit that the trial court applied the wrong law to this case, using La. R.S. 10:3-406 instead of La. R.S. 10:4-406. We first note that the applicable statutes were amended, effective January 1, 1994. We will apply the law as it existed in 1992. The general rule is that a person is not liable on an instrument unless his signature appears on it. La. R.S. 10:3-401; Stepter v. Hibernia National Bank, 524 So.2d 210 (La.App. 4 Cir.1988). The trial court apparently found that the plaintiffs were precluded from recovering the amounts obtained by Collins through the forgeries because Brown's negligence substantially contributed to the forgeries. This was pursuant to La. R.S. 10:3-406 which provided:
Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.
La. R.S. 10:4-406 imposed upon a bank customer a duty to exercise reasonable care and promptness to examine his bank statement to discover his unauthorized signature, or alterations to items, and promptly notify the bank after discovery. If the customer failed to comply with these duties, he was precluded from asserting against the bank the unauthorized signature or any alteration on the item if the bank also suffered a loss and if the bank had exercised ordinary care in paying the item.
The plaintiffs argue that La. R.S. 10:4-406, contained in Chapter 4 of Title 10, which chapter related specifically to "bank deposits *642 and collections," should have been applied to the facts of this case instead of La. R.S. 10:3-406, contained in Chapter 3 of Title 10, which chapter applied generally to "commercial paper." We disagree.
The two statutes are not mutually exclusive. The plaintiffs could have been precluded from recovering on the forgeries under either statute. The trial court simply found that Brown's negligence substantially contributed to the making of the unauthorized signatures and, because the court found that Whitney paid the instruments in good faith and in accordance with the reasonable commercial standards of the banking industry, Brown was precluded from recovering on the forgeries. This finding was according to the provisions of La. R.S. 10:3-406, which Louisiana courts have previously applied to forged check cases. See Stepter, supra; Curtis v. Hibernia National Bank in Jefferson Parish, 522 So.2d 705 (La.App. 5 Cir.1988); Ashley-Hall Interiors, Ltd., Inc. v. Bank of New Orleans, 389 So.2d 850 (La.App. 4 Cir.1980).
Once the plaintiff establishes that the bank has paid on a forged instrument, the burden shifts to the bank to prove three things to preclude the plaintiff from recovering on the forged instrument: (1) the customer negligently managed his account; (2) the negligence substantially contributed to the forgery; and (3) the bank paid the forged instrument(s) in accordance with reasonable commercial banking industry standards. Stepter, supra; La. R.S. 10:3-406.
Plaintiffs claim the trial court erred in finding that Brown was negligent and that Whitney paid the forged checks in accordance with reasonable commercial standards of the banking industry. The finding of negligence which substantially contributes to an unauthorized signature under La. R.S. 10:3-406 is a finding of fact. Curtis, supra. The finding that Whitney paid the forged checks in accordance with reasonable commercial banking industry practices is also a factual finding. This court's function on appellate review is to determine whether the evidence was sufficient for the trial court's factual findings, and whether those findings were clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Considering the evidence concerning Brown's lapses in handling the PGA account recited earlier in this decision, the evidence supports the finding that Brown was negligent, and that his negligence substantially contributed to the forgeries. We are unable to say that such a finding is clearly wrong.
We now address the real crux of this appeal, as we see it. That is, whether the court correctly found that Whitney paid the forged checks, or handled the account, in accordance with the reasonable commercial standards of the banking industry. Plaintiffs claim Whitney offered no proof of what constituted reasonable commercial banking industry standards. There was no testimony from a banking industry expert, or other person employed in the banking industry. Whitney counters that a joint stipulation established that Whitney used reasonable commercial banking industry standards in handling the PGA account. The stipulations referred to are those previously discussed concerning the check amounts which triggered verification of the maker's signature for commercial accounts prior to paying on the check: Whitney, $5,000.00 and over; First National Bank of Commerce, $10,000.00 and over; Hibernia National Bank, $20,000.00.
We believe this joint stipulation is sufficient to establish that Whitney's standards for verification were in accordance with reasonable commercial standards of the banking industry. The comparison to FNBC and Hibernia, both well-recognized large banking concerns in this jurisdiction, meets that burden. Although no evidence was presented as to the exact signature verification procedure employed by Whitney, signature verification means signature verification. A copy of the signature card for the account was introduced in evidence. It contains the signatures of Brown and the other three officers authorized to sign checks on the account. The signatures of the other three officers are normal, legible signatures. Brown's signature is nothing more than a semi-legible letter or two and a long loop. The forged signature on check number 6599, the only *643 check in the amount of $5,000.00 or over which would have triggered verification, similarly is composed of a semi-legible letter or two followed by a long loop.
There was no evidence proving beyond a reasonable doubt that Whitney verified this check. That was not necessary. Whitney proved that, because it verified checks in the amount of $5,000.00 and over written on commercial accounts, and this check was in the amount of $5,000.00 and thus subject to verification, it was more probable than not that Whitney routinely verified the signature and, therefore, paid the instrument in accordance with reasonable commercial standards of the banking industry. Unfortunately, the forgery was not detected. The fact that the forgery was not detected does not prove Whitney's verification procedures were not in accordance with reasonable commercial standards of the banking industry.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] There was no explanation why Brown did not use up any checks in the alignment process before printing out check number 6371.