STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-545

GLYNDA PRESTRIDGE, ET AL.

VERSUS

THE BANK OF JENA

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 215,078
HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, Elizabeth A. Pickett, Billy H. Ezell, and James T. Genovese, Judges.

**AFFIRMED IN PART AS AMENDED; REVERSED IN PART;
REMANDED WITH INSTRUCTIONS.**

AMY, J., dissents and assigns reasons.

PICKETT, J., dissents for the reasons assigned by Judge Amy.

Donald R. Wilson
Gaharan & Wilson
Post Office Box 1346
Jena, LA   71342
(318) 992-2104
COUNSEL FOR DEFENDANT/APPELLANT:
     Bank of Jena

S. Aaron Siebeneicher
Johnson & Siebeneicher, Inc.
Post Office Box 648
Alexandria, LA   71309
(318) 484-3911
COUNSEL FOR PLAINTIFFS/APPELLANTS:
     Glynda Prestridge
     Vera Prestridge

**David J. Boneno**
**666 North Street**
**Baton Rouge, LA   70802**
**(225) 387-3282**
**COUNSEL FOR:**
**Louisiana Bankers Association, Amicus Curiae**

**GENOVESE, Judge.**

The owners of a checking account brought suit against the bank which held the account to recover sums paid on checks forged by a relative of the account owners. The bank refused to restore the funds to the account, alleging that the forgeries could have been discovered and prevented if the account owners had reviewed the account statements during the six-month period in which the forgeries occurred. The trial court found that both the Plaintiffs and the Bank were responsible for the loss. The Plaintiffs were awarded $37,450.00 plus costs. Both parties appeal. For the following reasons, we affirm in part as amended, reverse in part, and remand with instructions.

## Factual and Procedural Background

On October 18, 2002, sisters Glynda Prestridge (Glynda) and Vera Prestridge (Vera) opened a checking account at the Libuse, Louisiana branch of Bank of Jena. Glynda testified that each sister signed a signature card while opening the account and that she took home a temporary checkbook that day, for use until she received her personalized, pre-printed checks for the account.[1] Glynda testified that she initially deposited a sum of money given to her by her son, Larry Prestridge (Larry), to repay a previous loan from Glynda and her husband. Glynda testified that her son continued to give her similar payments thereafter, which she also deposited into the account.

---

[1] In her deposition, Vera Prestridge stated that her name was only included on the account so that it could be accessed, if necessary, while Glynda and her husband were traveling. Vera stated that she never made a deposit into the account or wrote a check on the account, nor did she ever receive any correspondence at her home regarding the account.

1

The parties do not dispute that between October 29, 2002 and May 21, 2003, Marye Prestridge (Marye), Glynda's daughter-in-law,[2] obtained numerous blank checks on the account. The parties contend that Marye forged Glynda's name on them in order to take more than $60,000.00[3] from the account without the permission of either Glynda or Vera. Glynda testified that she did not receive any statements on the account until April 2003, when she found that the balance on the account was significantly lower than she had thought it was. She stated that she called Bank of Jena and learned that Marye had withdrawn money from the account twice that day. Glynda immediately had the account frozen, but was only able to recover approximately $5,700.00 of the missing money from Marye.

On November 3, 2003, Glynda and Vera brought suit against Bank of Jena, claiming it should reimburse the funds withdrawn from the account because it had breached its fiduciary duty and was negligent in paying on the forged instruments. The trial court ruled in favor of the Plaintiffs and awarded them $37,450.00 plus costs, which represented the amount of money they contend Marye withdrew from the account prior to January 22, 2003. The court found that after that date, the Plaintiffs were precluded from reimbursement due to their own negligence in not checking the statements. Both parties have appealed the trial court's decision. Although the Plaintiffs did not specify any assignments of error in their brief, they state that "[t]he result reached by the District Court was partially correct in finding for the Appellees, but Appellees believe that the entire amount of Sixty-One Thousand Eight Hundred

---

[2]Marye Prestridge was married to Glynda's son, Larry Prestridge, during the period that the checks were forged. However, Larry testified that he and Marye had divorced in 2003.

[3] Our review indicates that the Plaintiffs requested $71,650.00 in damages in their Petition for Damages. However, in his closing argument, counsel for the Plaintiffs stated that the Plaintiffs had suffered losses in the amount of $61,800.00.

($61,800.00) Dollars should have been awarded." In support of this assertion, the Plaintiffs suggest in their appellate brief that Bank of Jena had not exercised ordinary care in accordance with reasonable commercial banking industry standards in paying the checks. The Plaintiffs also allege in their appellate brief that their claim for the entirety of the lost money should not have been precluded because Glynda had not contributed to the forged signatures made by Marye Prestridge.

In its appellate brief, Bank of Jena asserts that the trial court erred in "failing to properly apply the provisions of [La.]R.S. 10:3-406 and [La.]R.S. 10:4-406 to the facts of this matter, in that a proper application thereof would preclude any recovery by Plaintiff[s]." Bank of Jena also asserts that the trial court erred in affording any recovery to the Plaintiffs and "in determining, implicitly, that BANK OF JENA failed to act in good faith, with ordinary care and in accordance with the reasonable commercial banking standards in discharging its duties to [Plaintiffs as customers] of the bank."

**Discussion**

Generally, a person is not liable on an instrument unless that person or his agent signed the instrument. La.R.S. 10:3-401. Furthermore, "the general rule is that a bank is liable when it pays based upon a forged signature." *Marx v. Whitney Nat'l Bank*, 97-3213, p. 4 (La. 7/8/98), 713 So.2d 1142, 1145. The Louisiana Supreme Court has defined the relationship between a bank and its depositor as a debtor-creditor relationship whose nature is contractual. *Id.* Therefore, where a charge on the account has been made due to a forged instrument, that order to pay was not issued by the customer and cannot be considered a charge authorized pursuant to the contract between the customer and the bank. *Id.*

3

Notwithstanding this general rule requiring the bank to bear the risk of loss for a forged instrument, Louisiana law provides that in certain circumstances, a customer may be precluded from asserting a claim against a bank that has paid on a forged instrument. *Id.* "Pursuant to La. R.S. 10:3-406 and 10:4-406, a customer is precluded from having funds paid out on a forged instrument restored to his account if his failure to exercise reasonable care in handling the account, either before or after the forgery, substantially contributed to the loss." *Id.* at 1145. At trial and on appeal, Bank of Jena asserts both of these statutory defenses as a bar to the Plaintiffs' claims.

*Customer Negligence Prior to Forgery*

Louisiana Revised Statutes 10:3-406 precludes a bank's customer from asserting a claim against the bank in connection with a forged instrument where the customer's own conduct substantially contributed to the forgery.[4] However, if the person asserting the preclusion, i.e., the bank, fails to exercise ordinary care in paying the instrument and that failure substantially contributes to the loss, La.R.S. 10:3-406(b) indicates that "the loss is allocated between the person precluded and the

---

[4] Louisiana Revised Statutes 10:3-406 provides:

(a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

(b) Under Subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

(c) Under Subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under Subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

4

person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss."

A trial court's findings as to whether the customer failed to exercise ordinary care, and whether that negligence substantially contributed to the forgery, are questions of fact that will be reviewed on appeal pursuant to the manifest error standard of review. *Med Data Serv. Bureau v. Bank of La. in New Orleans*, 03-2754, 03-2755 (La.App. 1 Cir. 12/30/04), 898 So.2d 482. Because Bank of Jena has alleged that Glynda, "albeit unknowingly, allowed her daughter-in-law access to the checkbook for this account[,]" Bank of Jena bears the burden of proving that Glynda's handling of the account substantially contributed to Marye's forgery.

The Louisiana Supreme Court considered a similar issue in *Marx*, 713 So.2d 1142. In *Marx*, a grandson forged checks on an account held by his grandfather, father, and aunt. The grandson had stolen the checks on the account during visits to his grandfather's home. The *Marx* court stated:

> No further facts were stipulated by the parties concerning where or how the checkbook was kept, the manner in which the grandson obtained blank checks of his grandfather, the frequency of his visits, or whether the grandfather had reason to be suspicious that his checks might be taken and his name forged on them. The mere fact that one family member has access to checks at the residence of another family member, without more, does not establish a failure to exercise ordinary care substantially contributing to the making of a forged signature so as to preclude recovery on a forged instrument.

*Id.* at 1146.

In the instant matter, Glynda testified that she kept all of her checkbooks and business papers at home in a drawer in her desk. However, she also stated that she did not necessarily write checks in sequential order, but instead used whichever book of checks is near and then balances her accounts when she receives her account

5

statements. Glynda and her son both testified that he had been given a key to Glynda's house, which Marye may have had access to. However, they both also testified that Larry was given the key for use in instances where Glynda was on vacation or the like, but that Marye had not been given permission to freely enter the home without the knowledge of Glynda or her husband.

Although Bank of Jena presented evidence that Marye may have had access to the checkbook on the account at issue, the bank did not offer any evidence relating to how or when the checks were stolen. Bank of Jena only established the possibility that a relative may have had access to enter Glynda's home without her permission. Accordingly, we find that the Plaintiffs were not precluded from recovery pursuant to La.R.S. 10:3-406 due to Glynda's failure to exercise ordinary care in maintaining her account information and checkbooks *prior* to the forgery.

*Customer Negligence Subsequent to the Forgery*

Louisiana Revised Statutes 10:4-406 states in relevant part:

> (a) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.

> . . . .

> (c) If a bank sends or makes available a statement of account or items pursuant to Subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

(d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:

(1) the customer's unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and

(2) the customer's unauthorized signature or alteration by the same wrongdoer on any **other** item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, **not exceeding thirty days**, in which to examine the item or statement of account and notify the bank.

(e) If Subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with Subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under Subsection (d) does not apply. (Emphasis added.)

On appeal, both parties have asserted the provisions of La.R.S. 10:4-406 in support of their respective positions. Bank of Jena asserts that the Plaintiffs should be precluded from recovery because they also failed to exercise reasonable care after the forgeries had been committed. Bank of Jena argues that Glynda had a duty to examine the monthly account statements sent to her, and that she failed either to examine them or to notify Bank of Jena that she had not received them before April 2003. The Plaintiffs, however, assert that Bank of Jena improperly paid on the instruments because it failed to verify the signatures on any of the checks at the time they were paid. The Plaintiffs suggest that Bank of Jena's procedure "was not a 'reasonable banking standard' in the Rapides Parish area, and thus [Bank of Jena] did not exercise ordinary care."

7

We will first consider Bank of Jena's argument relating to the application of La.R.S. 10:4-406. The Louisiana Supreme Court considered the application of La.R.S. 10:4-406 in *Marx*, 713 So.2d 1142, stating that "Subsection (d)(2) imposes on the customer the risk of loss on all subsequent forgeries by the *same wrongdoer* after the customer had a reasonable time to detect an initial forgery if the bank has honored subsequent forgeries prior to notice." *Id.* at 1146 (emphasis in original). The *Marx* court considered the history of the law relating to the same wrongdoer rule, including the language in the comments to the Uniform Commercial Code which recognizes a public policy in favor of imposing a duty of prompt examination of bank statements and notifications of forgeries or alterations in order to prevent a wrongdoer from repeating wrongful activity. *Id.*

The defendant-bank in *Marx* asserted the same wrongdoer rule should have precluded the plaintiffs from recovering ten thousand dollars for five checks drawn without their permission from their account by the grandson of the primary account holder. In *Marx*, the parties had stipulated that the grandfather had not looked at the January account statement, which contained evidence of five forged checks. He also did not review the statements for the months of February, March, or April, which would have revealed to him seventeen additional forged checks. After the addition of other joint owners onto the account in April, one of the new joint owners noticed the discrepancies in the first statement that he received, which was in May, and alerted the bank. The Louisiana Supreme Court found that the early detection of the grandson's forgeries could have prevented the **subsequent** losses, and that the grandfather's failure to review the January statement precluded the plaintiffs from

8

asserting **all subsequent** forgeries by that same unauthorized signatory, the grandson. The word "subsequent" in the *Marx* decision and the case at bar is significant.

As previously stated, the relationship between a depositor and a bank is contractual in nature. *See Marx*, 713 So.2d 1142. In the instant matter, the record contains a copy of the signature card signed by the Plaintiffs, which contains the terms and conditions of the contractual relationship. This document contains a section entitled "Statements" which reads:

> You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized payments or alterations, you must promptly notify us of the relevant facts. If you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we exercised ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items forged or altered by the same wrongdoer. You agree that the time you have to examine your statement and report to us will depend on the circumstances, but that such time will not, in any circumstance, exceed a total of **30 days** from when the statement is first made available to you.
>
> You further agree that if you fail to report any unauthorized signatures, alterations, forgeries or any other errors in your account within 60 days of when we make the statement available, you cannot assert a claim against us on any items in that statement, and the loss will be entirely yours. This **60 day** limitation is without regard to whether we exercised ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section. (Emphasis added.)

The thirty- and sixty-day time limitations contained in the "Statements" section of the signature card are likewise significant. The thirty-day time limitation "dovetails" with the thirty-day time limitation in La.R.S. 10:4-406(d)(2).

In his reasons for judgment, the trial judge applied the time periods as defined by the "Statements" section of terms and conditions outlined on the signature card. The trial judge noted that the account was opened on October 18, 2002, so that the

thirty-day period for the account holders to examine their statements for errors would have been November 18, 2002. The trial court then noted that the date of the first available account statement was November 22, 2002. The trial judge further noted that the sixty-day additional period would have ended on January 22, 2002. He stated that "January 22 would be the last possible date that this court would rule that she would have had to complain that her account had been defrauded." Based on this analysis, the court found that the nine checks that were dated between October 29, 2002 and January 17, 2003 could all be considered as having been paid during the time period allowed by the contract between the parties. The trial court then granted the Plaintiffs an award in the amount of those nine checks, which totaled $37,450.00.

Bank of Jena argues on appeal that the trial court should not have awarded the Plaintiffs any damages due to their failure to notify the bank of the forgeries within the time periods allotted in the account terms and conditions, or in an otherwise reasonably prompt manner. We disagree.

Our review of the record indicates that the account was opened on October 18, 2002. Glynda testified that she did not remember how much money had been originally deposited in the account, and that she knew that there were subsequent deposits, but that she did not know how many. She also stated that her son had made deposits into the account on her behalf. She stated that she had not noticed that she did not receive any statements on the account until April because she did not write checks on the account, and generally did not use it except to deposit money given to her by her son. However, in her testimony she also stated that she gave her son one signed, blank, temporary check and that she gave a signed blank check to Marye to use for the purchase of a truck for her grandson. Glynda also testified that she gave

10

a signed blank check to Marye in October 2002 for Marye to use to pay a medical bill. Glynda stated that she did not know the amount of the medical bill. Glynda also stated that she gave Marye a check in the amount of $8,000.00 on April 30, 2003 for Marye to use to pay a bill.

Glynda further testified that she had maintained another checking account with another bank for more than forty years and that she had balanced the checkbook on that account each month with the statement sent to her by the bank. With regard to the Bank of Jena account at issue, she stated that she did not read the account terms and conditions when she opened the account. Glynda testified that she did not realize that she had not received any statements on the Bank of Jena account because it was not her primary checking account. Raymond Shrock, who had worked as a vice-president and a branch manager for Bank of Jena at the time the Plaintiffs opened their account, testified that it was the bank's policy to send out monthly account information statements to all customers regardless of whether the account had experienced any activity during the preceding month, and that he had not received any communication from Glynda regarding her failure to receive them. Tom Griffin, who works for the financial data processing company employed by Bank of Jena, testified that his company sent monthly statements to Glynda's address. Mr. Griffin described his company's verification system, which ensures that each customer is sent their statement. William Tweedy, the president of Bank of Jena, testified that the bank's general policy, upon timely learning of a forgery from a customer, is to repay the stolen money to the customer and seek legal remedies against the person who committed the forgery.

Our review of the evidence supports a determination that Bank of Jena, as required by La.R.S. 10:4-406(a), made statements available to the Plaintiffs by sending Glynda the account information monthly. Further, the record supports a finding that Bank of Jena also proved that Glynda had not examined the statements that were sent to her, or alternatively, had not notified anyone at Bank of Jena that such statements were not received, for more than six months after the account had been opened. The evidence in the record demonstrates that the first check drawn on the account bears Glynda's own signature and was dated October 29, 2002. The account terms and conditions, as well as La.R.S. 10:4-406, required Glynda to verify the transactions on her monthly account statement within thirty days from said statement. Glynda would likewise be responsible for timely notifying the bank if and when she did not receive any monthly account statements.

Our review further indicates that the first forged check is dated November 5, 2002, which was within three weeks of the date that the account was opened, and would have also appeared on that first account statement. Therefore, with regard to this first check and the checks reflected on the first account statement, the record supports a determination that the Plaintiffs failed to timely satisfy the duties imposed upon them by La.R.S. 10:4-406(d)(2) and the "Statements" section of the deposit account terms and conditions contained on the signature card. As set forth above, this contractual provision required that the Plaintiffs examine their statement with "reasonable promptness," and, upon discovering unauthorized payments or alterations, to "promptly notify" the bank of the relevant facts. This duty applies to both items on a particular statement, as well as other items forged by the same wrongdoer.

In the event a statement is made available, as in the case at bar, La.R.S. 10:4-406(c) requires that "the customer must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." If an unauthorized payment is discovered, "the customer must promptly notify the bank of the relevant facts." Here, the Plaintiffs failed to do so within thirty days after the November 2002 statement; therefore, they cannot recover from the Bank of Jena for the amount of forged checks that would have appeared more than thirty days after the first statement, which the trial court found to have been issued November 22, 2002, as set forth in La.R.S. 10:4-406(d)(2).

Had the Plaintiffs reported the forgeries appearing within the legally allowed thirty-day period following the initial statement, it is likely that any subsequent forgeries could have been prevented. Both parties contend that all of the forgeries were committed by Marye Prestridge. Compliance with the duty imposed on the Plaintiffs to timely discover and report the initial forgeries thirty days after the November 20, 2002 bank statement would have given Bank of Jena the opportunity to seek prompt restitution for those sums of money and to prevent anyone other than the Plaintiffs, especially Marye, from accessing the account. Therefore, as provided by La.R.S. 10:4-406(d)(2), the Plaintiffs may not recover from Bank of Jena for the losses due to the **subsequent** forgeries committed by Marye Prestridge thirty days after the November 22, 2002 bank statement. Therefore, under La.R.S. 10:406(d)(2) and the *Marx* decision, Plaintiffs can only recover for forgeries up through December 22, 2002, which is thirty days after the first bank statement of November 22, 2002.

13

Plaintiffs' failure to report any forgeries thereafter preclude recovery by them after December 22, 2002.

However, because we find that the record supports a determination that the preclusion of La.R.S. 10:4-406(d) applies, the remainder of the statute must be considered in order to determine whether any apportionment of fault is required. *See* La.R.S. 10:4-406(e). Accordingly, we next consider Bank of Jena's assertion that the trial court erred in its further determination that it failed to exercise reasonable or ordinary care in paying on the forged checks.

In support of their counter-argument that Bank of Jena failed to exercise ordinary care, and that apportionment of fault is therefore appropriate, the Plaintiffs point out that the signatures which appear on the signature lines of the forged checks clearly do not match Glynda's signature as it appears on the signature card that she signed with Bank of Jena when she opened the account. The signatures on the forged checks are printed, whereas Glynda's signature on her signature card is written in cursive. The Plaintiffs contend that this failure to verify Glynda's signature was below the level of ordinary care and substantially contributed to their loss.

The trial court found that although the signatures on the checks at issue "appeared to be obvious frauds," Bank of Jena contributed to the loss by not checking the signatures on the checks against the signature card for the account during the check-clearing process. The trial court's finding that Bank of Jena did not exercise ordinary care in paying the forged checks is a finding of fact that this court will consider on appeal pursuant to the manifest error standard of review. *See Gulf States Section, PGA, Inc. v. Whitney Nat'l Bank of New Orleans*, 96-0844 (La.App. 4 Cir. 2/12/97), 689 So.2d 638.

14

According to La.R.S. 10:4-406, the customer bears the burden of proving that the bank failed to exercise ordinary care in paying on the fraudulent instruments and that the failure substantially contributed to the loss. "Ordinary Care" is defined within the Louisiana Revised Statutes Chapter relating to Commercial Laws - Negotiable Instruments as follows:

> (7) "Ordinary care" in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this Chapter or Chapter 4.

La.R.S. 10:3-103(a)(7).

Comment 4 to La.R.S. 10:4-406 also discusses "ordinary care," providing in relevant part:

> The term "ordinary care" used in subsection (e) is defined in Section 3-103(a)(7), made applicable to Article 4 by Section 4-104(c), to provide that sight examination by a payor bank is not required if its procedure is reasonable and is commonly followed by other comparable banks in the area. The case law is divided on this issue. The definition of "ordinary care" in Section 3-103 rejects those authorities that hold, in effect, that failure to use sight examination is negligence as a matter of law. The effect of the definition of "ordinary care" on Section 4-406 is only to provide that in the small percentage of cases in which a customer's failure to examine its statement or returned items has led to loss under subsection (d) a bank should not have to share that loss solely because it has adopted an automated collection or payment procedure in order to deal with the great volume of items at a lower cost to all customers.

Our review of the record in the instant case reveals that Bank of Jena had adopted an automated means of clearing its checks, by sending them to Computer Services, Inc ("CSI"). Tom Griffin, who is a regional manager for CSI for Texas, Louisiana, and Arkansas, stated that his company clears checks for Bank of Jena as

15

well as more than five hundred other banks nationally. Mr. Griffin explained this process as relevant to the instant case as follows: the foreign bank[5] would receive the forged instrument from Marye; that night the foreign bank would send the checks to the Federal Reserve to be credited for the availability of funds; the next day CSI would receive all checks payable from Bank of Jena and charge the amount due to those respective accounts at Bank of Jena. Mr. Griffin stated that CSI then electronically photographed the checks and kept the original paper checks for ninety days before destroying them. Mr. Griffin stated that, as long as there is not a hold for insufficient funds on the check, Bank of Jena never sees the paper check and can only view the checks electronically. Mr. Griffin testified that he did not know which other banks in the parish also sent their checks to a company similar to CSI to be cleared, or which had an in-house process for clearing them. However, he did state that "[w]ho does it, how [the checks] go out and how they come back, they're all the same, the clearing process."

Mr. Tweedy also discussed the system for clearing checks drawn from Bank of Jena accounts but deposited in other banks. He stated that it was necessary for a bank of that size to contract out the clearing of checks and mailing of statements to a data processing company like CSI because Bank of Jena was too small to spare the personnel for those tasks. He also stated that "some other banks and the Bank of Jena joined together to form an L.L.C. to where we could get a multibank discount with CSI to handle the processing." Similar to Mr. Griffin, he described the same system by which checks are cleared through CSI, and Bank of Jena never receives the paper

---

[5] With the exception of the one check cashed at Bank of Jena on April 8, 2003, our review of the record indicates that the other checks entered into evidence were taken to BankOne, where Larry testified that Marye had an account. The checks were either presented for payment at BankOne or were deposited into a checking account, and the funds withdrawn at a later time.

checks, which he stated is consistent with an overall trend toward electronic banking. Mr. Tweedy also testified that even the largest forged check for $15,000.00 would not have required checking the signature card due to the high balances in Glynda's accounts.

The Plaintiffs argue in their appellate brief that Bank of Jena's failure to verify signatures on the instruments did not meet the reasonable banking standard and refer to the testimony of Richard Starling, who they presented as an expert witness in the field of local and general banking practices in Rapides Parish. Mr. Starling stated that Mr. Griffin's description of data processing was accurate. He stated that during his experience in the banking industry he had dealt with many forgeries and that the printed signatures on the checks in the instant matter would have been "a red flag" which would have prompted him to check the signature card and request identification from the person presenting the check. He also stated that he believed that checks in large amounts, for example the check in the instant matter for $15,000.00, should have been brought to the attention of Bank of Jena for verification.

The Plaintiffs point to Mr. Starling's testimony in support of their argument that Bank of Jena had not exercised ordinary care in managing the Plaintiffs' account. They also note that Bank of Jena did not present any expert witnesses to rebut Mr. Starling's testimony to that effect. However, this court held that "uncontradicted expert testimony should be accepted as true in the absence of circumstances in the record that cast suspicion on the reliability of the testimony." *Arnold v. Town of Ball*, 94-972, p. 8 (La.App. 3 Cir. 2/1/95), 651 So.2d 313, 319. Furthermore, in discussing the discretion due a trial court's acceptance or rejection of expert witness testimony,

17

the fourth circuit has remarked that "[t]he weight to be given to the testimony of experts is largely dependent upon their qualifications and the facts upon which their opinions are based. Even uncontradicted expert testimony is not binding on the factfinder." *Penton v. Healy*, 04-1470, p. 4 (La.App. 4 Cir. 1/26/05), 894 So.2d 537, 540 (quoting, *Gulf Outlet Marina, Inc. v. Spain*, 02-1589 (La.App. 4 Cir. 6/25/03), 854 So.2d 386, *writ denied*, 03-2075 (La. 11/7/03), 857 So.2d 497), *writ denied*, 05-975 (La. 6/3/05), 903 So.2d 463). *See also Fernandez v. Pizzalato*, 04-1676 (La.App. 4 Cir. 4/27/05), 902 So.2d 1112.

In the instant matter, we note that Mr. Starling stated that he had not worked in a bank for ten years and that he was familiar with general banking principles, but not with new banking technology. Further, although he was accepted as an expert in local banking practices, he stated that he was not familiar with the internal practices of the banks in Rapides Parish regarding signature verification. When asked his opinion about the practice of not verifying signatures by Bank of Jena and CSI , Mr. Starling stated:

> Well, my opinion is I'd want to know more about their operation or somebody's got to be responsible for looking at these checks. I don't care where, some banks don't look at every signature. The technology of banking has changed. If they looked at every check, we would never get it through. We've got to go with technology. But when you go into that bank to cash that check, I don't care if you gave me your check and I went to your bank to cash it, banks like Bank One, probably Hibernia, mostly likely Regions, they're going to have on a screen something, maybe where they can look at the signature if they want to. I don't know, but that's technology.

The record indicates that the present circumstances cast suspicion on the reliability of Mr. Starling's testimony as an expert regarding the requirements of current banking standards in Rapides Parish. Specifically, Mr. Starling's lack of recent experience within the banking industry, in addition to his admission that he did not

18

know the internal practices of other local banks, or what information would be available to tellers making a transaction, suggests that more information would have been necessary to form an expert opinion regarding the banking standards in Rapides Parish at the time of the forgeries.

After review, we do not find that overall the record supports a determination that the Plaintiffs have proven that Bank of Jena failed to adhere to a reasonable commercial standard, prevailing in the area, when paying on the instruments at issue. The information available in the record regarding the procedure followed by Bank of Jena in paying checks drawn on its accounts indicates that Bank of Jena instituted a reasonable procedure, as contemplated by the legislative pronouncement of La.R.S. 10:3-103(a)(7), in maintaining this account. Testimony was provided that other area community banks use data processing companies like CSI to process their checks using a similar check-clearing process. Accordingly, because the Plaintiffs have not proven that Bank of Jena failed overall to exercise ordinary care, as that term is defined in the law, in handling their account, the loss due to the forgeries should not be allocated between the parties. Additionally, the preclusion pursuant to La.R.S. 10:4-406(d) applies to the Plaintiff's claims against Bank of Jena thirty days after the statement of November 22, 2002 as hereinabove set forth.

**Summary of Claims and Disposition**

Plaintiffs want Bank of Jena to credit their account $61,800.00 for paying on indisputably forged instruments. Bank of Jena wants to be absolved of any liability to Plaintiffs because of Plaintiffs' failure to timely check their monthly account statements, and because more than sixty days had elapsed since the issuance of the

19

monthly statements reflecting the forged instruments, as set forth in the signature card agreement.

Plaintiffs allege that Bank of Jena failed to follow reasonable banking standards by not verifying signatures on any of the checks at the time paid. Bank of Jena claims that it employed acceptable electronic banking practices by adopting an automated means of clearing its checks as do five hundred other banks nationally and, therefore, exercised ordinary care in paying on the fraudulent instruments.

As stated herein, both the contract on the reverse side of the signature card and La.R.S. 10:4-406(d)(2) allow Plaintiffs a thirty-day period from the issuance of their monthly account statement to identify any forged instrument and notify the bank accordingly. A person is not liable on an instrument unless that person or his agent signed the instrument. *See* La.R.S. 10:3-401. The general rule is that a bank is liable when it pays based upon a forged signature. *Marx*, 713 So.2d 1142. Neither the facts nor the record in this case negates that general rule up through said thirty-day time period. Therefore, Bank of Jena is liable unto Plaintiffs for paying on fraudulent instruments up through December 22, 2002, which is thirty days after the trial court found the first bank statement to have been issued. The trial court judgment is affirmed in that regard, but amended to allow Plaintiffs to recover only for forged instruments up through thirty days after the first bank statement, i.e., December 22, 2002, and no further.

We reverse the trial court judgment that Bank of Jena failed to exercise ordinary care in the handling of Plaintiffs' account after December 22, 2002, and find that the Plaintiffs did not meet their burden of proving that Bank of Jena failed to adhere to a reasonable commercial standard, prevailing in the area, when paying on

20

fraudulent instruments at issue after December 22, 2002. Certainly, a bank is allowed to employ "electronic banking" and other state of the art technology, but that does not excuse a bank from following the general rule that it is liable when it pays upon a fraudulent instrument within the time constraints of the contract, and particularly La.R.S. 10:4-406(d)(2). A bank cannot simply avoid all liability to its customers by pleading the self-serving defense of "electronic banking" at any time after the account is opened, and not protect its customers from fraudulent instruments during the aforementioned thirty-day period. "Electronic banking" does not negate the legal duty of a bank. Any check-clearing technological advance relied upon and implemented by a bank must be of such a nature that it will protect bank customers against fraudulent instruments; otherwise, signature cards are rendered useless, and the bank can simply claim "electronic banking" as a defense to a forgery occurring during the thirty-day period set forth herein.

In the instant matter, Bank of Jena was "outsourcing" its check clearing and no one was verifying signatures on checks. Mr. Tweedy, the President of the Bank of Jena, testified that even a $15,000.00 check would not have required checking the signature card for a valid signature. This banking procedure, automated or not, does not protect the customer against fraudulent instruments, violates the contractual obligation between the bank and its customer, and therefore makes the bank liable for paying on said fraudulent instruments during that thirty-day period.

Bank of Jena strongly relies on the "60 day limitation" set forth in the "Statements" section of the terms and conditions on the reverse side of the signature card signed and agreed to by Plaintiffs. Bank of Jena claims that once this sixty-day period lapses, that Plaintiffs are entirely precluded from recovering on all claims

21

against the bank for paying on fraudulent instruments. By arguing this concept of preclusion, Bank of Jena is actually raising the defense of prescription, or peremption, against Plaintiffs' claims. Bank of Jena alleges that it is not liable unto Plaintiffs for any damages as a result of paying on the forged instruments because more than sixty days have lapsed from the issuance of the bank statement without notification by Plaintiffs to the bank of any discrepancy, as set forth in the signature card agreement. Neither negotiable instruments law nor the law of contract has any such sixty-day prescriptive or peremptive period. Bank of Jena is not permitted to contractually establish its own prescriptive or peremptive period. As stated previously in *Marx*, our law defines the relationship between a bank and its depositor as a debtor-creditor relationship whose nature is contractual. *Id*, 713 So.2d 1142. When a bank pays on a forged instrument, it breaches its contract with the depositor. By contract, Bank of Jena attempted to limit its liability by establishing a sixty-day preclusionary period after which no recovery could be had against it. However, the law limits contractual freedom. Louisiana Civil Code article 3471 states: "A juridical act purporting to exclude prescription, to specify a longer period than that established by law, or to make the requirements of prescription more onerous, is null." In *Contours Unlimited, Inc. v. Board of Commissioners of the Port of New Orleans*, 93-1269 (La.App. 4 Cir. 12/30/93), 630 So.2d 916, *writ denied*, (La. 3/18/94), 634 So.2d 863, a contractual provision which specified only a thirty-day prescriptive period was declared a nullity because it established a more onerous prescriptive period than that provided by law.

The sixty-day preclusionary period set forth in Bank of Jena's signature card agreement attempts to shorten the legal prescriptive period, making it more onerous;

therefore, it is null as set forth in La.Civ.Code art. 3471. Bank of Jena's sixty-day preclusion argument is without merit.

Therefore, we conclude that the trial court erred in allowing Plaintiffs to recover any of the funds paid by the Bank of Jena on the checks forged by Marye after December 22, 2002, which is the date thirty days after the November 22, 2002 statement. Pursuant to La.R.S. 10:4-406(d), the Plaintiffs' failure to comply with their duties to examine their account statements, or to notify Bank of Jena that they had not received such statements with reasonable promptness, precludes them from asserting claims against Bank of Jena related to subsequent or other forgeries on the account after December 22, 2002. Further, the losses on the account after December 22, 2002 may not be allocated between the parties because the Plaintiffs did not meet their burden of proving that Bank of Jena failed to exercise the standard of care required by law in paying on these **subsequent** or **other** forged instruments. Because we cannot determine from the record the exact amount of the forgeries up through December 22, 2002, we remand this matter to the trial court for a hearing to determine said amount and to grant a judgment in favor of the Plaintiffs in accordance therewith.

### DECREE

For the foregoing reasons, the judgment of the trial court in favor of the Plaintiffs, Glynda Prestride and Vera Prestridge, is affirmed in part as amended, reversed in part, and remanded to the trial court for a hearing to determine the exact amount of any forgeries up through December 22, 2002. All costs of this proceeding are assessed equally among the parties.

**AFFIRMED IN PART AS AMENDED; REVERSED IN PART; REMANDED WITH INSTRUCTIONS.**

23

NUMBER 05-545

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

GLYNDA PRESTRIDGE, ET AL.

VERSUS

THE BANK OF JENA

AMY, J ., dissenting.

I respectfully dissent from the majority opinion. Chiefly, I disagree that the plaintiffs are entitled to any recovery given the present circumstances. Rather, the terms and conditions of the plaintiffs' contract with the bank and La.R.S. 10:4-406, when coupled with the plaintiffs' failure to timely report irregularities with the account, precludes recovery.

The evidence supports a determination that Bank of Jena made monthly statements available to the plaintiffs, *see* La.R.S. 10:4-406(a), and that the plaintiffs neither examined the statements nor notified it that statements were not received for more than six months after the account was opened. Significantly, the terms and conditions contained on the account signature card reveal the following contractual agreement between the parties:

> You must examine your statement of account with *"reasonable promptness."* If you discover (or reasonably should have discovered) any unauthorized payments or alterations, you must *promptly notify* us of the relevant facts. If you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we exercised ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items forged or altered by the same wrongdoer. You agree that the *time you have to examine your statement and report to us will depend on the circumstances, but that such time will not, in any circumstance, exceed a total of 30 days from when the statement is first made available to you.*
>
> You further agree that if you *fail to report any unauthorized signatures, alterations, forgeries or any other errors in your account within 60 days of when we make the statement available, you cannot*

*assert a claim against us on any items in that statement, and the loss will be entirely yours.* This 60 day limitation is without regard to whether we exercised ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

(Emphasis added.)

The plaintiffs failed to report the initial irregularities within the periods specifically provided for by contract. This contractual period is significant in light of La.R.S. 10:4-406(c) which states that "the customer must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized." It further provides that, if an authorized payment should have been discovered, "the customer must promptly notify the bank of the relevant facts." (Emphasis added). As the plaintiffs failed to do so within the period of "reasonable promptness," required by La.R.S. 10:4-406(c) and further defined by the parties' contractual agreement, the plaintiffs cannot recover for the initial forgeries.

With regard to subsequent forgeries, La.R.S. 10:4-406 provides:

> (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:
>
> . . . .
>
> (2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, *not exceeding thirty days*, in which to examine the item or statement of account and notify the bank.

Again, the plaintiffs failed to notify the bank of the irregularities within this time frame. Finally, pursuant to La.R.S. 10:4-406(e), and because the plaintiff did not establish that the bank failed to exercise ordinary care, the loss cannot be allocated.

2

*See also* La.R.S. 10:3-103(a)(7); La.R.S. 10:4-406, comment 4.

In short, I conclude that the trial court erred in allowing the plaintiffs to recover any funds paid by the Bank of Jena on the checks forged by Marye Prestridge. Pursuant to the contractual terms and conditions of the account and La.R.S. 10:4-406(d), the plaintiffs' failure to comply with their duties to examine their account statements, or to notify Bank of Jena that they had not received such statements with reasonable promptness, precludes them from asserting claims against Bank of Jena related to the forgeries on the account.

I respectfully dissent.

3