898 So.2d 482 (2004)
MED DATA SERVICE BUREAU, L.L.C.
v.
BANK OF LOUISIANA IN NEW ORLEANS and Nikki Anderson
Bank of Louisiana
v.
Nikki Anderson and Med Data Service Bureau, L.L.C.
Nos. 2003 CA 2754, 2003 CA 2755.
Court of Appeal of Louisiana, First Circuit.
December 30, 2004.
*484 Bruce M. Danner, Madisonville, Counsel for Plaintiff/Appellee Med Data Service Bureau, L.L.C.
Henry L. Klein, New Orleans, Counsel for Defendant/Appellant Bank of Louisiana.
Before: FOIL, PARRO, and KUHN, JJ.
KUHN, J.
An employee stole multiple checks from her employer, forged the payees' signatures, and presented them at her bank for deposit into her account and/or for payment. In the proceedings below, the trial court found that the bank's action of depositing and/or paying the checks constituted conversion. On appeal, we consider whether the trial court erred: 1) in determining that the bank customer's employer had not entrusted its employee with responsibility with respect to the checks such that the forged indorsement did not preclude recovery by the employer, and 2) in failing to find that the business practices of the bank customer's employer substantially contributed to the making of the forged signatures. Finding no error, we affirm the trial court's judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND
Med Data Service Bureau, L.L.C. ("Med Data") provides computerized billing and collection services on behalf of various health care providers. As payment for these services, Med Data receives a percentage of the amounts it collects each month. During 1999, Med Data's clients included Drs. Alma Levy and Alberto Suarez, who are both physicians practicing medicine in Covington, Louisiana. Pursuant to its business arrangement with these physicians, Med Data provided information *485 to various insurance companies to facilitate the processing of claims and the collection of payments due to these physicians. The checks received from the insurance companies were drawn to the order of the individual physician to whom payment was due, but were mailed to Med Data's Covington office. After receiving the checks, Med Data entered the receipt of payment in its computer system and either deposited the funds into the physician's bank account or delivered the checks directly to the physician, according to each physician's request.
During July through November 1999, one of Med Data's employees, Nikki Anderson, intercepted twenty-five checks that had been mailed to Med Data and were payable to either Dr. Levy or Dr. Suarez.[1] Anderson forged the respective physician-payee's signature and either deposited the full amount of the funds in her account at Bank of Louisiana or deposited a portion of the funds and received the balance in cash.[2] All of the checks in question bore the physician-payee's forged indorsement and Anderson's indorsement. Ultimately, Anderson withdrew all funds credited to her account.
At the end of each month, Med Data sent a report of outstanding claims to each physician. After receiving one of these reports, Dr. Levy questioned why she had not received payment on a particular account. Initially, Anderson handled the inquiry. The following month, another employee made the inquiry, and the insurance company ultimately provided a copy of the checks, which each bore the forged physician-payee indorsement. On that day, Anderson left the office mid-day and later called to apologize to her supervisor for her actions. During April 2000, Anderson pled guilty to the charge of felony theft and is currently serving a sentence of six years at hard labor with the Louisiana Department of Public Safety and Corrections.
In March 2000, after Anderson's actions were discovered, Bank of Louisiana filed suit against Anderson and Med Data in the Civil District Court for the Parish of Orleans, bearing docket number XXXX-XXXX, seeking to recover the amount of funds that had been credited to Anderson's account. By judgment dated August 1, 2000, the district court granted Med Data's declinatory exception raising the objection of improper venue and transferred the matter to the Twenty-Second Judicial District Court for the Parish of St. Tammany ("22nd J.D.C."), where it was assigned the docket number XXXX-XXXXX.
Both Drs. Levy and Suarez assigned to Med Data their claims against Bank of Louisiana and Anderson arising from the forged indorsements of the various checks. In July 2000, Med Data, as assignee of the payees, filed a petition for damages against Anderson and Bank of Louisiana in the 22nd J.D.C. for the Parish of St. Tammany, bearing docket number XXXX-XXXXX. Med Data alleged that Bank of Louisiana, as the depository bank, had provided credit to Anderson's account upon deposit of the confiscated checks without verifying the indorsements appearing on the checks. It alleged that Bank of Louisiana's conduct diverted funds from Drs. Levy and Suarez to Anderson's account at Bank of Louisiana. Med Data claimed Bank of Louisiana's actions constituted conversion pursuant to Louisiana Revised Statutes 10:3-420, and sought to recover $28,889.68, the amount of the funds that were diverted, *486 plus legal interest. In March 2001, the trial court signed an order consolidating the two pending suits.
During the trial of these suits, Sharon McDaniels, a co-owner of Med Data, testified she exercised managerial control over all of the departments within her company. She stated that when Anderson was initially hired, she worked as a charge entry clerk, which involved inputting patients' demographic information into the computer system. Anderson later worked as a "payment problem poster." In that capacity, Anderson was one of the persons in charge of contacting insurance companies to inquire why Med Data had not received particular account payments. McDaniels explained that this job duty was rotated between Anderson and the other people within her department. As a payment problem poster, Anderson's job duties included obtaining missing information, resubmitting insurance claims, and checking claims that had been outstanding for more than sixty days by reviewing "aging" reports that Anderson's manager provided to her. McDaniels testified that neither charge entry clerks nor payment problem posters have any job duties relating to checks.
Med Data's deposit clerks handled all of the checks Med Data received. The deposit clerks routinely waited for the mail delivery and, upon its arrival, collected the mail, opened it, recorded the checks received, and immediately prepared deposit slips for the various doctors that had received payments. As the checks were processed, two or three deposit clerks were always present. The deposit clerks copied all checks and logged them into the physicians' payment logs. After the deposit clerks processed the checks, they locked them in a file drawer until an independent courier service picked up the checks for delivery to either the physicians or their banks. Anderson never worked as a deposit clerk, and her desk was not located in close proximity to the room where the deposit clerks worked.
Although Anderson's job duties did not encompass the handling of business checks, McDaniels surmised that Anderson took the checks from Med Data's mailbox; McDaniels opined that Anderson would not otherwise have had an opportunity to access the checks after the deposit clerks collected the mail. McDaniels explained that Med Data received its mail at its business location in an unlocked rural mailbox that was located on the street approximately 100 yards from Med Data's front entrance. The United States Postmaster had denied Med Data's requests to have its mailbox locked.
Because Anderson apparently stole the checks before Med Data's deposit clerks processed them, Med Data's business records did not reflect that the insurance company had paid the claims. McDaniels explained that because Anderson was the one reviewing the aging reports, she purposefully failed to adjust them to reflect the particular payments she intercepted. McDaniels also believed that Anderson destroyed the insurance companies' explanation of benefits that accompanied the payments to prevent detection of her actions.
McDaniels stated that Anderson's job duties did not involve opening the mail or checking the mail. McDaniels explained that she believed she had employed adequate "checks and balances" within her business by having one department to handle checks and a separate department to check on the status of the claims. Before discovering Anderson's theft, Med Data had not experienced any problems involving stolen checks. McDaniels testified that there had been no notice of any problems until one of the doctors questioned *487 why she had not received payment on a particular account.
McDaniels testified that before hiring Anderson, Med Data had checked an employer reference provided by Anderson, which indicated a physician had previously employed her. McDaniels had contacted the physician's widow, who verified that Anderson had been a good employee. After the defalcations were discovered, Med Data more closely scrutinized Anderson's employment history and discovered that the dates pertaining to this particular employer had been falsified. Although she had actually worked for the physician that she had listed as a reference, she had also subsequently worked for another employer, who suspected that Anderson had stolen large sums of money from him.
Judy Heckel, Senior Vice President and manager of the St. Tammany Shopping Center branch of Bank of Louisiana, verified that Anderson presented the stolen checks at her branch location. Heckel testified that Anderson had maintained a joint account at Bank of Louisiana with her husband for many years, and the bank had experienced no problems with the account. Heckel explained that in dealing with an established customer that has a good track record, such as Anderson, the bank permits each branch manager to allow its tellers to use his or her discretion in determining whether to accept a second indorsement check. The checks presented by Anderson were second indorsement checks because they bore the physician-payee's purported indorsement and the indorsement of someone other than the payee, i.e., Anderson's indorsement. Heckel confirmed that, generally, when dealing with a second indorsement check, the bank did not require confirmation of a payee's indorsement; Heckel explained that if the payee indorsement is not valid, then the bank's customer, the second endorser, is responsible to the bank.
Regarding the twenty-five checks in question, Heckel testified that the bank's tellers, who accepted these checks for deposit and/or payment, took no action to confirm the validity of either Dr. Levy or Dr. Suarez's indorsement, presumably because the tellers knew Anderson to be a responsible customer.[3] Although the physician-payees were not customers of Bank of Louisiana, such that their signatures would have been available for verification, Heckel acknowledged that the bank could have contacted the physicians' offices to find out whether these physicians had indeed endorsed the checks. She confirmed there had been occasions when the bank had previously called a physician's office to verify an indorsement when the customer was not well known. Heckel also stated that, based on her years of experience, she would more than likely have been suspicious if she had been the teller presented with these checks made out to local physicians and drawn against out-of-state issuing banks, upon noticing that Anderson had presented this type of check multiple times. Heckel also testified that based on her experience, she would have required confirmation of the physicians' indorsements, although the bank did not require such a confirmation.[4]
*488 By judgment dated July 16, 2003, the trial court ordered the confirmation of preliminary default judgments against Anderson in favor of Med Data and Bank of Louisiana in the amount of $28,889.68, plus legal interest thereon from the date of judicial demand until paid, and for all costs of the proceedings. The trial court also ordered judgment in favor of Med Data and against Bank of Louisiana for $28,889.68, with legal interest thereon from the date of judicial demand, until paid, and for all costs of the proceedings.[5]
Bank of Louisiana has suspensively appealed, urging the trial court erred by failing to: 1) impose liability on Med Data pursuant to Louisiana Revised Statutes 10:3-405, contending Med Data was the party who could have prevented the resulting loss by adopting measures to prevent forged indorsements, and 2) preclude Med Data from recovering because it "substantially contributed" to the forgeries as set forth in Louisiana Revised Statutes 10:3-406.[6]

II. ANALYSIS

A. Conversion
Louisiana Revised Statutes 10:3-420 states, in pertinent part:
(a) An instrument is converted when
* * *
(iii) it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.[7]
*489 The undisputed facts establish that Bank of Louisiana made a payment to Anderson who was not entitled to enforce the checks.

B. Employer's Responsibility for a Fraudulent Indorsement by an Employee
Bank of Louisiana does not contest that it converted the checks in question. Rather, it submits that Louisiana Revised Statutes 10:3-405(a)(3) precludes Med Data's recovery in this case because it entrusted Anderson with the responsibility of keeping track of payments for services rendered in her capacity as a "charge entry clerk." Section 3-405 provides:
(a) In this Section:
(1) "Employee" includes an independent contractor and employee of an independent contractor retained by the employer.
(2) "Fraudulent indorsement" means (i) in the case of an instrument payable to the employer, a forged indorsement purporting to be that of the employer, or (ii) in the case of an instrument with respect to which the employer is the issuer, a forged indorsement purporting to be that of the person identified as payee.
(3) "Responsibility" with respect to instruments means authority (i) to sign or indorse instruments on behalf of the employer, (ii) to process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition, (iii) to prepare or process instruments for issue in the name of the employer, (iv) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer, (v) to control the disposition of instruments to be issued in the name of the employer, or (vi) to act otherwise with respect to instruments in a responsible capacity. "Responsibility" does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access.
(b) For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.
(c) Under Subsection (b), an indorsement is made in the name of the person to whom an instrument is payable if (i) it is made in a name substantially similar to the name of that person or (ii) the instrument, whether or not indorsed, is deposited in a depositary bank to an *490 account in a name substantially similar to the name of that person.
Bank of Louisiana contends that Med Data, as Anderson's employer, should bear the ultimate responsibility for any defalcations committed by its employees because Med Data was in a far better position than it was to control Anderson's actions.
Initially, we note that the checks involved herein were not payable to Med Data, the employer of Anderson, and the checks did not bear an indorsement purporting to be that of Med Data. Moreover, Med Data was not the issuer of any of these checks. Accordingly, we find there was no "fraudulent indorsement" as contemplated by Section 3-405(a)(2).
Moreover, we conclude that the evidence does not establish that Med Data entrusted Anderson with "responsibility" with respect to the checks it received within the meaning of Louisiana Revised Statutes 10:3-405(a)(3). The testimony of McDaniels establishes that Anderson had no authority to sign, indorse, process, prepare, or control the disposition of any checks received by Med Data. Anderson did not supply information for instruments to be issued in Med Data's name, and she had no job duties relating to the receipt or deposit of checks.
McDaniels believed Anderson stole checks from Med Data's mailbox. She explained that the deposit clerks did not leave the checks unattended from the time they retrieved them from the mailbox until they were processed and delivered to the courier service for delivery to the bank or the physicians. As set forth in this statute, "responsibility" does not include authority that merely allows an employee to have access to instruments that are part of incoming mail. Accordingly, since Med Data did not entrust Anderson with responsibility with respect to the checks and since there was no fraudulent indorsement, we find no basis for precluding Med Data's recovery based on the provisions of Louisiana Revised Statutes 10:3-405.

C. Negligence Contributing to a Forged Signature
Louisiana Revised Statutes 10:3-406 provides:
(a) A person whose failure to exercise ordinary care substantially contributes to ... the making of a forged signature on an instrument is precluded from asserting ... the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.
(b) Under Subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.
(c) Under Subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under Subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.
Bank of Louisiana asserts that Med Data's negligence substantially contributed to the making of the forged checks and that Med Data should be precluded from asserting the forgeries. Specifically, Bank of Louisiana asserts that Med Data failed to police Anderson's activities of monitoring the overdue accounts and that Anderson's knowledge regarding these accounts should be imputed to Med Data.
Because Bank of Louisiana is asserting the preclusion, it bears the burden of proving that Med Data failed to exercise ordinary care. See La. R.S. 10:3-406(c). Louisiana Revised Statutes 10:3-103(a)(7) *491 provides, in pertinent part, "`Ordinary care' in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." "Person" includes "an individual or an organization." La. R.S. 10:1-201(30). "Organization" includes "a corporation, ... partnership or association, ... or any other legal or commercial entity." La. R.S. 10:1-201(28).
Whether Med Data failed to exercise ordinary care and whether this negligence substantially contributed to the making of a forged signature on a check are findings of fact. See Gulf States Section, PGA, Inc. v. Whitney National Bank of New Orleans, 96-0844 (La.App. 4th Cir.2/12/97), 689 So.2d 638, 642. As such, this court's function is to determine whether there is a factual basis to support the trial court's factual findings and whether the trial court's factual findings are clearly wrong. Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993).
We find the record supports the trial court's findings that Med Data did not authorize Anderson to handle checks it received and that Med Data did not place Anderson in a position to have contact with the checks. Further, considering the testimony of McDaniels regarding Med Data's business practices, and particularly her testimony explaining the division of duties between the deposit clerks and Med Data's other employees, we find no manifest error in the trial court's implicit finding that Med Data's business practices did not contribute to the making of the forged signatures. Most importantly, Bank of Louisiana failed to introduce any evidence regarding "reasonable commercial standards" for the receipt and handling of checks or collection procedures utilized by a business engaged in medical collections in the Covington area. Accordingly, Bank of Louisiana failed to establish that Med Data failed to exercise ordinary care in its business practices, as defined by Louisiana Revised Statutes 10:3-103(a)(7), with respect to the manner in which it handled checks, divided duties amongst its employees, or monitored its employees. Although Anderson purportedly accessed the checks in question via Med Data's mailbox, Bank of Louisiana failed to establish that Med Data's practice of utilizing an unlocked mailbox failed to comply with the "reasonable commercial standards" of a business engaged in medical collections in the Covington area, particularly where the business had not previously experienced any theft of its mail. Thus, Bank of Louisiana has failed to establish that Med Data is precluded from asserting the forgeries against the bank.

III. CONCLUSION
For these reasons, we affirm the trial court's judgment in favor of Med Data. Appeal costs are assessed against Bank of Louisiana.
AFFIRMED.
NOTES
[1] Anderson was employed by Med Data from March 29, 1999, to November 17, 1999.
[2] The parties stipulated that Anderson was a customer of the Bank of Louisiana at all pertinent times.
[3] Heckel testified that as of the trial date, none of these tellers remained employed by Bank of Louisiana.
[4] Some of the deposits made by Anderson were "split deposits," involving the bank depositing a portion of the funds into Anderson's account and paying the balance of the funds to her in cash. Heckel testified that these transactions ordinarily required a supervisor's approval. She explained that since Anderson made these split deposits in the evening when no supervisor was present, the tellers had discretion to accept the check without supervisor approval.
[5] In reasons for judgment, the trial court noted that Bank of Louisiana's claims against Med Data presented in docket number 01-10560 are moot, stating that they are "hereby dismissed." The trial court, however, did not address Bank of Louisiana's claims presented against Med Data in its judgment. We note the record establishes Bank of Louisiana collected the funds in question from the respective payor banks upon presentment of the checks bearing the forged indorsements, and the payor banks have not pursued claims for reimbursement against Bank of Louisiana. Neither Bank of Louisiana nor Med Data have assigned error to the trial court's failure to dispose of Bank of Louisiana's claims against Med Data in the judgment. Because the trial court disposed of all claims set forth in Med Data's suit, the judgment is a final one with respect to the suit bearing docket number 00-13145. See Louisiana Civil Procedure articles 1841 and 1915; ANR Pipeline Co. v. Louisiana Tax Com'n, 2001-2594 (La.App. 1st Cir.3/20/02), 815 So.2d 178, affirmed and remanded, XXXX-XXXX (La.7/2/03), 851 So.2d 1145.
[6] Bank of Louisiana's assignments of error focus on the actions of Med Data rather than the actions of the physician-payees, who assigned their claims to Med Data. Because Med Data, as plaintiff, stands in the shoes of the respective physician-payees as assignee, any negligence on behalf of Med Data would not necessarily preclude Med Data's recovery in this capacity. On appeal, however, Bank of Louisiana focuses solely on Med Data's alleged negligence. Therefore, for the purpose of addressing the Bank of Louisiana's assignments of error, we assume that the actions of Med Data, as the physician-payees' agent, may have been attributable to the physician-payees, and should be considered in determining Med Data's entitlement to recovery.
[7] Louisiana Revised Statutes 10:3-420(b) provides, "An action for conversion of an instrument may not be brought by ... a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or co-payee or (iii) by the drawer." The parties stipulated that Med Data received all checks before their presentment to Bank of Louisiana. According to the Uniform Commercial Code comment following Section 3-420, "The payee receives delivery when the check comes into the payee's possession, as for example when it is put into the payee's mailbox." Also see Patterson v. Livingston Bank, 509 So.2d 6 (La.App. 1st Cir.1987), wherein this court found that a payee's allegation that a check was mailed to him was sufficient to establish a claim of constructive delivery by a "true owner" of a check pursuant to former Louisiana Revised Statutes 10:3-419. We also note that Bank of Louisiana does not dispute that Med Data's receipt as agent for the payee-physicians constituted receipt by the payee-physicians.