978 So.2d 393 (2007)
DEAN CLASSIC CARS, L.L.C. and Bob G. Dean, Jr.
v.
FIDELITY BANK AND TRUST COMPANY, State of Louisiana Through the Department of Public Safety, Office of Motor Vehicles, and James E. Jordan, Jr.
No. 2007 CA 0935.
Court of Appeal of Louisiana, First Circuit.
December 21, 2007.
*394 William D. Treeby, Samantha P. Griffin, New Orleans, LA, for Plaintiffs-Appellees, Dean Classic Cars, L.L.C. and Bob G. Dean, Jr.
James P. Doré, Amy D. Borret, Baton Rouge, LA, for Defendant-Appellant, Fidelity Bank and Trust Company.
Mark L. Ross, Lafayette, LA, for Intervenor-Appellant, Chubb Group of Insurance Cos.
James E. Jordan, Jr., Baton Rouge, LA, Defendant In Proper Person.
*395 Before CARTER, C.J., PETTIGREW, and WELCH, JJ.
CARTER, C.J.
Plaintiffs, Bob G. Dean, Jr. and Dean Classic Cars, L.L.C., sought to recover losses sustained as a result of a former employee's fraudulent action of stealing multiple checks, forging plaintiffs' indorsements, and presenting the forged instruments for deposit into the employee's personal bank account. In the proceedings below, the trial court found in favor of plaintiffs, holding that the bank's action of depositing the forged checks constituted conversion. The bank and its insurer appeal, primarily arguing that the trial court erred in failing to find that plaintiffs bore responsibility for the losses because of their lack of sufficient internal auditing controls. Finding no error, we affirm the trial court's judgment.

FACTUAL AND PROCEDURAL HISTORY
Bob Dean Enterprises, Inc. ("BDE") provides management services to various companies owned by Bob G. Dean, Jr. ("Dean"), including Dean Classic Cars, L.L.C. ("DCC"), a licensed Louisiana automobile dealer that was organized to buy, sell, and hold title to company vehicles used by Dean's various company's employees and Dean's antique and exotic vehicle collection. The vehicle collection ordinarily consisted of 50 to 100 vehicles, and was housed at both a warehouse owned by Dean and at Dean's personal residence. DCC did not have any employees, but Dean instructed and supervised various BDE employees regarding DCC work and activities.
In 1997, Dean hired James E. Jordan, Jr. ("Jordan"), a former Louisiana state trooper, as an employee of BDE. Initially, Jordan handled workers' compensation matters for Dean's various companies. Eventually, Jordan's duties expanded to include responsibility for handling bills of sale and titles to the vehicles owned by DCC, as well as becoming a licensed salesman to assist Dean in the buying and selling of the vehicles for Dean's private collection.
Unbeknownst to Dean and BDE employees, Jordan had a serious gambling addiction. In 2002, Jordan began to use fraudulently prepared financial statements, documents, and titles for the DCC vehicles to secure personal loans from Fidelity Bank and Trust Company ("Fidelity") and several other banks in order to cover his gambling debts. In late 2002 and throughout 2003, Jordan also devised a scheme to intercept checks made payable to DCC and/or Dean, including three checks that Jordan deposited into his personal checking account at Fidelity.[1] In each instance, Jordan stole the checks, forged the respective signatures for DCC and/or Dean, personally indorsed the checks, and then deposited the funds into his checking account at Fidelity. Neither Dean nor any of his companies had bank accounts at Fidelity. Despite bank policies to the contrary, Fidelity permitted Jordan to deposit the checks made payable to DCC and/or Dean into his personal checking account without manager or officer approval, and without verifying the validity of the indorsements *396 appearing on the checks or Jordan's authority to deposit the third party checks.
One of the checks deposited by Jordan represented proceeds for a loan obtained by Dean and DCC in December 2003 after the purchase of several vehicles. Jordan somehow confiscated the $278,000.00 check and deposited it in his Fidelity checking account before Dean was even aware that the loan had been successfully processed and funded. When Dean questioned Jordan regarding the whereabouts of the loan proceeds, Jordan concocted a story about title problems on the vehicles used to secure the loan.[2] Jordan maintained the title problem story line each time he was questioned until March 2004. At that time, Dean pressed Jordan for receipt of the loan proceeds or a speedy resolution to the title problems within twenty-four hours. The pressure from Dean resulted in Jordan confessing to Dean that he had stolen the loan check along with several other checks, and that he had previously used some titles to DCC vehicles in order to secure numerous loans to cover his gambling debt. After the confession, Jordan ultimately pled guilty to an elaborate embezzlement scheme and was sentenced to serve time in a federal penitentiary.
Plaintiffs, DCC and Dean, filed suit against Fidelity on April 7, 2004, alleging that Fidelity's action of depositing the third-party checks without verifying the indorsements or authority for the deposit of corporate checks into a personal account, constituted unlawful and negligent conversion of the funds pursuant to LSA-R.S. 10:3-420, and therefore, plaintiffs were entitled to an award of damages, legal interest, and costs relative to Fidelity's handling of the forged corporate checks.[3] Fidelity answered, denying all allegations of negligence and asserting that plaintiffs were responsible for the loss because Jordan was a "responsible employee" within the meaning of LSA-R.S. 10:3-405. Fidelity also alleged that plaintiffs had insufficient internal auditing controls that allowed Jordan to engage in the embezzlement scheme. Finally, Fidelity's insurer, Chubb Group of Insurance Companies ("Chubb"), intervened in the lawsuit to recoup funds that it had paid to Fidelity for payment on the three fraudulently indorsed checks.
During trial on January 23-24, 2007, Dean and several accounting employees of BDE testified that Jordan: (1) did not have check-signing authority for Dean or DCC, (2) did not have authority to prepare deposit slips, (3) did not have authority to make deposits of corporate checks into his personal checking account, (4) did not have authority to indorse corporate checks made payable to Dean or DCC, and (5) was not a signatory on any of Dean's accounts, including DCC. Jordan acknowledged all of these facts, emphasizing that he did not have any accounting or bookkeeping duties, and he had no check writing authority for Dean or any of Dean's businesses.[4] It was established that Jordan's *397 role in bank deposits for plaintiffs was to simply transport the deposits to the bank and return with the deposit slips for BDE accounting staff. There was also testimony that Jordan never had primary responsibility for the initial receipt of the mail for BDE; instead, different designated BDE employees at different times would handle the mail. However, Jordan testified that he occasionally would have DCC mail distributed directly to him and he would open it. Testimony from the loan officer at Fidelity revealed no one at Fidelity took any steps to verify Jordan's authority to indorse checks for Dean or DCC on any of the three checks involved. Further, no one at Fidelity verified that Dean's indorsement was authentic. The loan officer agreed that it was a "total violation of acceptable bank practice" for the three corporate checks to be deposited into Jordan's personal account without an officer's approval or without verification of the indorsements and of Jordan's authority to indorse and deposit the checks.
Dean testified that he initially hired Jordan based upon the recommendation of one of his friends. He took for granted that Jordan's reputation was good because Jordan was a retired state trooper who had been a former president of the state trooper's association, and Jordan's father was a former sheriff. Dean trusted Jordan and did not see the need for a background check. Dean denied any knowledge of Jordan's gambling addiction until Jordan confessed to his fraudulent activities.[5] Dean testified that he personally supervised Jordan, and he was a "hands-on" manager for his companies. It was undisputed that Jordan could not transact any business on behalf of plaintiffs without Dean's authority. The evidence revealed that Jordan, as well as Dean and two other BDE employees, had access to the titles for the vehicles owned by DCC. Also, a security code was required to access the physical inventory of vehicles. Dean described Jordan as having clerical type duties such as making phone calls, filing, preparing documents, including bills of sale and titles, and making arrangements for insurance and repairs on vehicles. The testimony reflected that Jordan also occasionally helped facilitate the buying and selling of vehicles under Dean's supervision.
Additionally, Dean testified that he periodically checked on the titles and bills of sales for the DCC vehicles, and he personally had access to all of the vehicles and titles every day. BDE's chief financial officer, Angela Courville, testified that she personally maintained an inventory list of the vehicles owned by DCC and she always reconciled the list with the general accounting ledger. After the discovery of Jordan's embezzlement scheme, she began to reconcile the physical inventory with the titles to the vehicles as well. Both Dean and his chief financial officer maintained their belief that the internal accounting and auditing controls for DCC and BDE were sufficient to detect fraud with the small number of employees involved in the companies. They testified that until Jordan's *398 embezzlement, they had never experienced any kind of fraud or theft of checks affecting Dean's businesses.
Fidelity's expert in accounting and assessment of internal controls, Scott Ginn, testified that Dean's accountants should have used restrictive endorsements such as "for deposit only" on all incoming checks for Dean's companies. Ginn testified that restricted access to the vehicles and to the titles was a good internal control, but in addition, different people should perform a reconciliation of the physical inventory with the titles in order to prevent fraud. He also testified that the only way to control the theft of checks coming in the mail is to control receipt of the mail, to make a record of incoming checks, to use restrictive endorsements on all checks that are received, and to follow up to ensure that deposits are made. Ginn emphasized that a segregation of duties was essential for internal controls. Ginn acknowledged that no one that was involved with Dean's companies knew how the three checks got into Jordan's possession, and Jordan had a propensity for forging signatures. Ginn also acknowledged that if Jordan stole the checks before the checks were processed at DCC, then a restrictive endorsement procedure would have been meaningless under that scenario.
Dr. William Staats, the financial management and banking expert offered by plaintiffs, testified on rebuttal that internal controls had nothing to do with the fraud that occurred with the three checks, because reconciliation of titles with inventory would not have limited Jordan's ability to forge indorsements on the checks. Staats focused on Fidelity's "haphazard" loan approval practice and its failure to follow general banking policies resulting in the deposit of forged checks into Jordan's account. Staats testified that had Fidelity properly underwritten the loans by verifying all of the information provided by Jordan and then followed standard banking policies by verifying indorsements and authority for deposits when accepting third party checks, Jordan's fraud would have been detected. Staats testified on rebuttal that the segregation of the physical inventory and the titles for the DCC vehicles was sufficient to control fraud because the vehicles could not be sold unless there was access to the car and delivery could be made.
According to BDE's chief financial officer, the money from DCC's vehicle sales was not typically received until actual delivery of a vehicle. The accounting system was set up for DCC to allow for tracking of the sales, which were then reconciled with the inventory list. DCC did not have an accounts receivable ledger because the vehicles were typically not sold with installment payments. Any checks received at DCC were posted to the accounting ledger and copies were attached to the deposit slips. Bank statements were reconciled with the accounting program. The chief financial officer testified that she believed all of the internal controls were sufficient to detect fraud after the checks were received by DCC, but Jordan apparently stole the checks before they could be processed and Jordan was able to replace funds before questions arose about missing deposits.
After trial, the trial court found in favor of plaintiffs, holding that Jordan's embezzlement scheme was not something that would have been easily detected by different internal controls. The trial court awarded plaintiffs $299,424.70, plus interest and costs, for the amount converted by Fidelity, thereby denying Fidelity's and Chubb's claims that plaintiffs were responsible for the loss. Both Fidelity and Chubb appealed, contending that the trial *399 court erred in failing to find that plaintiffs could have prevented Jordan's frauds by instituting more internal auditing controls. Fidelity also argues that the trial court erred in excluding portions of Jordan's deposition and in permitting plaintiffs' banking expert to testify regarding internal controls. Additionally, Fidelity complains that the trial court's written judgment does not comport with its assigned reasons.

STANDARD OF REVIEW
Whether Dean failed to exercise ordinary care in supervising Jordan and whether plaintiffs could have prevented Jordan's embezzlement scheme by instituting more internal accounting controls are questions of fact. Med Data Service Bureau, L.L.C. v. Bank of Louisiana in New Orleans, 03-2754 (La.App. 1 Cir. 12/30/04), 898 So.2d 482, 491. This court's function is to determine whether there is a reasonable basis to support the trial court's factual findings and whether the trial court's factual findings are clearly wrong or manifestly erroneous. Id.; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).
An appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646, 650. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Where a fact finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.

LAW AND ANALYSIS
The general rule established by long-standing jurisprudence is that when a bank pays on a forged check, it is liable for the amount of the checks, plus legal interest from the date of judicial demand. Marx v. Whitney National Bank, 97-3213 (La.7/8/98), 713 So.2d 1142, 1145; Cable Cast Magazine v. Premier Bank, Nat. Ass'n, 98-0676 (La.App. 1 Cir. 4/1/99), 729 So.2d 1165, 1166, writ denied, 99-1257 (La.6/18/99), 745 So.2d 31. A statutory exception to the general rule is provided in LSA-R.S. 10:3-405 when fraudulent indorsements are made in the name of an employer by an employee with respect to instruments payable to the employer and to which the employer has given responsibility to the employee. This exception adopts the principle that the risk of loss for fraudulent indorsements by employees who are entrusted with responsibility with respect to checks should fall on the employer rather than the bank that takes the check or pays it, if the bank was not negligent in the transaction. This provision is based on the belief that the employer is in a far better position to avoid the loss by using care in choosing employees, in supervising them, and in adopting other measures to prevent forged instruments in the name of the employer. Cable Cast, 729 So.2d at 1167. See also 2003 Uniform Commercial Code Comments, LSA-R.S. 10:3-405. Another statutory exception is provided in LSA-R.S. 10:3-406(a), where a person is precluded from asserting a claim against the bank acting in good faith when conduct before funds are paid out on a forged instrument substantially contributed to the loss. See Marx, 713 So.2d at 1145-1146.
Louisiana Revised Statute 10:3-420(a)(iii) provides that an instrument is converted when it is taken by transfer from a person not entitled to enforce the instrument. The undisputed facts establish that Fidelity made payment by depositing *400 plaintiffs' corporate checks into Jordan's personal checking account when Jordan was not entitled or authorized to enforce the checks. Fidelity does not contest that it converted the checks in question. The Fidelity employee that testified at trial, Warren L. Kron, candidly admitted that a bank officer such as himself should have approved all three of the third-party checks presented for deposit by Jordan, but only one check was approved. Kron also testified that he had not verified the indorsements or Jordan's authority for the indorsements on any of the checks. Instead, he simply accepted Jordan's representation that he was Dean's partner. Kron agreed without hesitation that the deposits were a "total violation of acceptable bank practice" and that he had personally exercised poor judgment in his dealing with Jordan, who was a "very smooth talker" and a "very likable person." Any appearance of Jordan's authority came directly from Jordan himself and no employee of Fidelity questioned Jordan's authority. It is well-established that the mere fact than an employee has managerial status or presents himself as being in charge of a company's office or as a partner of a corporation does not entitle third persons to assume that the employee has authority to execute or indorse corporate checks. See Confederate Welding and Safety Supply, Inc. v. Bank of the Mid-South, 458 So.2d 1370, 1375 (La.App. 2 Cir. 1984), writ denied, 462 So.2d 1264 (La.1985); Pargas, Inc. v. Taylor's Estate, 416 So.2d 1358, 1362 (La.App. 3 Cir.1982). The expert testimony and Fidelity's employee's testimony support a finding that Fidelity's actions fell below reasonable commercial standards of ordinary care in the banking industry.
Fidelity submits that LSA-R.S. 10:3-405(a)(3) precludes plaintiffs' recovery in this case because Jordan was a "responsible employee" in that he had responsibility with respect to the forged instruments. Fidelity also argues that plaintiffs are precluded from recovery pursuant to LSA-R.S. 10:3-406, because of their negligent lack of internal controls that substantially contributed to Jordan's ability to forge the indorsements on the corporate checks.
From a review of the record, we find LSA-R.S. 10:3-405 does not apply in this case. That provision states, in pertinent part:
(a) In this Section:
* * *
(2) "Fraudulent indorsement" means (i) in the case of an instrument payable to the employer, a forged indorsement purporting to be that of the employer,
* * *
(3) "Responsibility" with respect to instruments means authority (i) to sign or indorse instruments on behalf of the employer, (ii) to process instruments received by the employer for bookkeeping purposes, for deposit to an account, or for other disposition, (iii) to prepare or process instruments for issue in the name of the employer, (iv) to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer, (v) to control the disposition of instruments to be issued in the name of the employer, or (vi) to act otherwise with respect to instruments in a responsible capacity. "Responsibility" does not include authority that merely allows an employee to have access to instruments or blank or incomplete *401 instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access. (Emphasis supplied.)
The testimony at trial established that Jordan was not an employee of DCC, rather he was an employee of BDE and performed work for DCC under Dean's supervision. While the evidence clearly established that Jordan made fraudulent indorsements on checks made payable to plaintiffs, representing his signature to be that of Dean or DCC, the evidence also revealed that Jordan was not entrusted with "responsibility" as defined by LSA-R.S. 10:3-405(3). He did not have authority to sign or indorse any checks on behalf of plaintiffs. Jordan did not have authority to process any received checks for bookkeeping purposes or to prepare or process any checks for Dean or any of Dean's businesses. The evidence established that Jordan's only duty with respect to corporate checks was to transport the deposit slips to and from the bank. Other employees of BDE always prepared the deposit slips and processed the checks that were received. Therefore, Jordan was not a "responsible" employee by definition. Jordan's mere access to corporate checks when he occasionally directly handled mail for DCC and when he transported deposits to the bank for plaintiffs, did not make him have "responsibility" for the checks.[6] We find this case to be factually distinguishable from our decision in Cable Cast, upon which Fidelity heavily relies, because the employee in that case was vested with authority to process checks received for deposit into the account used by her employer. Jordan did not have any such authority in this case.
Moreover, we are not persuaded by the argument that plaintiffs were negligent because they did not have better internal controls with regard to the reconciliation of vehicle titles with physical inventory and restrictive endorsements on all checks that were received. Kron's admission of his failure to exercise ordinary care by failing to follow standard banking procedures and Fidelity's own internal policies for deposits of corporate checks with multiple indorsements into a personal account, precludes Fidelity from trying to shift full responsibility for the loss to plaintiffs. See Cable Cast, 729 So.2d at 1168; Confederate Welding, 458 So.2d at 1375-1376. See also 2003 Uniform Commercial Code Comments, LSA-R.S. 10:3-405 and LSA-R.S. 10:3-406.
We find the record supports the trial court's finding that Jordan was not placed in a position that was authorized to handle plaintiffs' checks. We find no manifest error in the trial court's implicit finding that plaintiffs' business practices did not contribute to Jordan's ability to steal the checks, forge indorsements on the checks, and present them for deposit into his personal checking account at Fidelity.[7] We also find that Fidelity *402 failed to establish that plaintiffs' internal controls fell below the standard of ordinary care. In fact, Fidelity did not compare any other relevant businesses to that of DCC to show what reasonable commercial standards prevailed, as provided by LSA-R.S. 10:3-103(a)(7).[8] The evidence revealed that plaintiffs had controls in place with regard to receipt of mail by designated employees, the processing of checks, a general accounting ledger for sales of vehicles, and segregated access to titles and physical inventory. Fidelity failed to establish that plaintiffs' failure to have a practice in place to reconcile the vehicle titles with the physical inventory on a regular basis was below "reasonable commercial standards." The lack of evidence of any previous fraud or theft in Dean's businesses also reasonably supports the conclusion that plaintiffs' internal controls were sufficient. Likewise, considering the small size of Dean's private vehicle collection and the segregation of duties pertaining to mail, accounting, titles, and inventory, we find that plaintiffs exercised "ordinary care."
Finally, we conclude that regardless of whether plaintiffs could have employed more rigorous internal auditing controls, Fidelity simply cannot shift responsibility for this loss. Fidelity completely failed to exercise ordinary care by accepting the forged corporate checks for deposit into Jordan's personal account without following reasonable banking standards and its own internal policies of verifying the authenticity of and authority of the indorsements. The primary obligation to determine whether there is a forged indorsement is rightly placed in this case on Fidelity, whose business is banking. See Pargas, 416 So.2d at 1362-1363. In this case, we believe it was more reasonable for plaintiffs to assume that Jordan was honest than it was for Fidelity to assume that Jordan had the authority to indorse corporate checks without requiring verification of that authority.
For these reasons, we affirm the trial court's judgment in favor of plaintiffs, Bob G. Dean, Jr. and Dean Classic Cars, L.L.C.[9] Appeal costs are assessed equally against appellants, Fidelity Bank and *403 Trust Company and Chubb Group of Insurance Companies.
AFFIRMED.
NOTES
[1] Jordan's embezzlement scheme encompassed far more than three checks, but we focus on the three checks that resulted in this trial court judgment rendered against Fidelity. The three checks, totaling $299,424.70 are as follows: (1) June 3, 2003 deposit of a $20,000.00 check made payable to DCC; (2) July 8, 2003 deposit of a $1,424.70 check made payable to DCC; and (3) December 19, 2003 deposit of a $278,000.00 check made payable to Dean and DCC.
[2] According to Dean and BDE's chief financial officer, Jordan's story was believable and reasonable because title problems were common for purchases of antique and exotic vehicles.
[3] The lawsuit brought by plaintiffs also involved multiple claims regarding the Fidelity loans obtained by Jordan pursuant to fraudulent titles on DCC vehicles, including a claim against the State of Louisiana, through the Department of Public Safety, Office of Motor Vehicles. However, the only claims left unresolved at the time of trial involved Fidelity as the sole defendant on the three checks fraudulently indorsed by Jordan and deposited in his personal checking account at Fidelity, and the subrogation claim of Fidelity's insurer, Chubb Group of Insurance Companies.
[4] Jordan gave his testimony in a deposition taken at the federal prison where he was incarcerated for his embezzlement crimes. The deposition testimony was offered in lieu of live testimony at trial. Jordan testified that early on in his employment for BDE, he sometimes signed other names to checks at their direction; however, this statement was not corroborated by any other witness' testimony or evidence. Additionally, the timeframe for which Jordan alleged he had signed other names to checks was not relevant to the checks at issue.
[5] In his deposition testimony, Jordan testified that he had not discussed his gambling addiction with Dean, but that Dean was aware that he frequented the casinos. Dean denied any knowledge of Jordan's gambling problems.
[6] We note that we have carefully reviewed Jordan's full deposition testimony, which was proffered by Fidelity and compared it to the version of Jordan's deposition that was admitted into evidence. We do not find that the trial court abused its great discretion in controlling the admission of this deposition testimony. Most of what Jordan testified to in his deposition was covered by other witness' live testimony at trial. Therefore, we find no merit to Fidelity's assignment of error regarding the trial court's exclusion of certain portions of the deposition that primarily consisted of attorney colloquy. We also note that the proffered deposition had missing pages throughout as well.
[7] In this regard, we also find that the trial court did not abuse its great discretion in admitting the rebuttal evidence offered by plaintiffs' expert, Staats. Rebuttal evidence is to be confined to new matters adduced by the defense and is not to be a repetition of the plaintiff's case. Capel v. Langford, 98-1517, (La.App. 3 Cir. 4/28/99), 734 So.2d 835, 847, writs denied, 99-2080, 99-2086 (La. 10/29/99), 749 So.2d 637, 638; Combs v. Hartford Ins. Co., 544 So.2d 583, 588 (La.App. 1 Cir.), writ denied. 550 So.2d 630 (La. 1989). The matter of admission of rebuttal evidence is largely within the discretion of the trial court. Id.; State ex rel. Guste v. Nicholls College Foundation, 592 So.2d 419, 422 (La.App. 1 Cir.1991), writ denied, 593 So.2d 651 (La. 1992); LSA-C.E. 611 E. Accordingly, Fidelity's assignment of error regarding Staats' rebuttal testimony is without merit.
[8] Fidelity's expert made general references to the handling of titles, accounts receivable, and inventory for large car dealerships that sell to the general public, but not any private car collection businesses. Louisiana Revised Statutes 10:3-406(c) places the burden of proving that plaintiffs failed to exercise ordinary care on Fidelity. "Ordinary care" means observance of reasonable commercial standards, prevailing in the area in which the company is located, with respect to the business in which the company is engaged. LSA-R.S. 10:3-103(a)(7); Med Data, 898 So.2d at 490-491.
[9] Lastly, we note that we find no merit to Fidelity's assignment of error alleging that the trial court's written judgment did not comport with its reasons. A trial court's written reasons for judgment form no part of the judgment itself, and where there is a conflict between the judgment and the written reasons, the judgment controls. Babin v. Burnside Terminal, Greater Baton Rouge Port Com'n, 577 So.2d 90, 98 (La.App. 1 Cir.1990). We disagree with Fidelity's assertion that there is a conflict. The trial court's judgment denied any relief for Fidelity, and its reasons accurately reflect that decision.